## MATTER OF FARINAS

## In Deportation Proceedings

### A-4699844

*Decided by Board September 15, 1967*

A gross miscarriage of justice occurred where respondent, an unrepresented alien, was ordered deported in November 1946 but from November 1947 to May 15, 1950, the date of his actual deportation, such decision could not have withstood judicial attack under the interpretation of the prevailing law as laid down by the Supreme Court in *Delgadillo* v. *Carmichael,* 322 U.S. 388, and other cases; hence, respondent having been granted permission to reapply and waivers of the grounds of excludability, the present proceedings under section 242(f) of the Immigration and Nationality Act are terminated.

CHARGE:

Order: Act of 1952—Sections 241(a)(2) [8 U.S.C. 1251(a)(2)] and 242(f) [8 U.S.C. 1252(f)]—Previously deported on ground enumerated in section 242(e).

ON BEHALF OF RESPONDENT:
Charles J. Wong, Esquire
755 Commercial Street
San Francisco, Calif. 94108
(Brief filed)

ON BEHALF OF SERVICE:
Stephen M. Suffin
Trial Attorney
(Brief filed)

Respondent appeals from the decision of the special inquiry officer finding him deportable as charged, and granting him voluntary departure with an alternate order of deportation to the Philippines.

Respondent is a 64-year-old married male alien, a native and citizen of the Philippines, who last entered the United States at Honolulu, Hawaii on or about September 9, 1966 as a visitor for pleasure. In earlier proceedings he testified that he first entered the United States at Hawaii on June 14, 1922 and arrived in the continental United States at San Pedro, California in either December 1923 or January 1924. He remained in this country continuously from that time, with the exception of occasional brief crossings into Mexico, the last one being in 1929, until he was deported from the United States in May 1950.

In November 1935, respondent was charged, in the Superior Court, San Joaquin, California, with burglary in the first degree. After proceedings in which he was represented by counsel, he was convicted of burglary in the second degree (a crime involving moral turpitude, cf. *Matter of V—T—*, 2 I. & N. Dec. 213), and on January 25, 1936 was sentenced to imprisonment for eight years. With time off for good behavior, etc., he was discharged in 1941.

After his release, respondent worked for the Libby Company which sent him to Alaska as one of a group of cannery workers in the summers of 1941, 1942, 1943 and 1944. The company made all arrangements for their transportation from California to Alaska and back, and it was respondent's recollection that they went sometimes by airplane and sometimes by boat. During the 1942 trip north, the boat stopped in the port of Vancouver, B.C., Canada, and the workers were transferred to another boat which took them the rest of the way to Alaska. Respondent was ashore for about an hour, for the purposes of the transfer, but there is no showing that he had anything to do with, or knew anything of, the arrangements for the stopover and transfer in the Canadian port. Immigration Service records show him as being thereafter admitted at Ketchikan, Alaska on June 20, 1942.

In September 1944, a two-count information was filed against respondent in the Superior Court, King County, State of Washington, charging abduction of a female under 18 for the purpose of sexual intercourse or marriage without the consent of her legal guardian, and carnal knowledge and abuse of a female under the age of 18. He was represented by counsel and pleaded guilty to the first charge on December 5, 1944; the second was dismissed on December 22, 1944. He was sentenced to imprisonment for a maximum term of not more than 10 years, and started serving his sentence.

Deportation proceedings were instituted in early 1945. Respondent was charged with being deportable as one excludable at the time of his June 1942 entry, under the Act of February 5, 1917, because of prior conviction of crime involving moral turpitude (burglary, second degree), and with being deportable under the same Act because he had been sentenced to imprisonment for a year or more after conviction of a crime involving moral turpitude committed within five years after entry (abduction).

The hearings were held, without interpreter, at the State Penitentiary in Walla Walla, Washington. Respondent, when asked if he wished counsel, stated that he did and was given a two-week adjournment. At the continued hearing, on September 12, 1945, respondent testified that he had not yet secured counsel. The special inquiry officer declared that the hearing would proceed and in the event re-

spondent should later secure counsel, his attorney could contact the Immigration Service and would be afforded an opportunity to review the proceedings to that date.

At the hearing, it was clearly established that respondent was a native and citizen of the Philippines; that he had touched at a Canadian port in 1942 when the company transportation provided for a transfer of boats and he had gone ashore for that purpose; and that he was the person referred to in the record showing Mariano Farinas to have been admitted at Ketchikan, Alaska on June 20, 1942. He identified as relating to him the two convictions referred to above and sought to explain the circumstances leading to the second conviction, but was advised this was not relevant. He was advised that he would be served with a copy of the proposed findings of fact, conclusions of law and order, and advised of his appeal rights. He was served on November 23, 1945, but did not file exceptions within the specified period. Both of the warrant charges were sustained, and in ordering him deported to the Philippines, it was specifically recommended that execution of the warrant of deportation be deferred until such time as respondent was released from imprisonment.

The Commissioner of Immigration, on review, amended the order only to the extent of holding that since respondent had been inadmissible for a cause existing at the time of entry, deportation was to be at the expense of the transportation company. The case then came before the Board, which on November 12, 1946, rendered a decision holding respondent deportable on the first charge only. The Board was of the opinion that it was possible respondent had taken the girl for the purpose of marriage, and that moral turpitude might not inhere in abduction for that purpose. Since it was sustaining the first charge, the Board held it would not pass on whether respondent's 1944 conviction was for a crime involving moral turpitude. It was affirmed that execution of the warrant of deportation should be deferred until respondent was released from prison.

Respondent finished serving his sentence in 1950 and was deported to the Philippines on May 15, 1950. He never returned to the United States until his entry of September 9, 1966.

At the present hearing, at which respondent was represented by counsel and communication was through an official interpreter, in the Ilocano dialect, the Government rested after introducing the warrant of deportation, showing execution on May 15, 1950 via the USNS Simon B. Buckner. Although making no claim that permission to reapply for admission had ever been applied for or received, respondent denied deportability, contending that the 1950 deportation was improper and invalid. It was urged that he had not made an entry in

June 1942 and therefore could not be found deportable for crime prior to entry, and it was further contended that at the time of respondent's original entry and at all times until 1946, he was a United States national and that the Act of 1917 therefore did not apply to him.

At the close of the hearing, the special inquiry officer rendered an oral decision finding respondent deportable on the charge contained in the order to show cause. It was bottomed upon his holding that the arrival in Alaska in June 1942 had properly been deemed an entry. He stated:

* * * Counsel, presumably referring to *Rosenberg* v. *Fleuti*, 374 U.S. 449, contends that this was not an entry within the meaning of the immigration laws. He also contends that as the respondent was then a national of the United States, he was not deportable.

At the time of respondent's deportation, *Fleuti* had not been decided by the Supreme Court. Under the law as it was then interpreted, the respondent had made an entry into the United States after his stop at Vancouver, B.C., Canada. * * *

It may well be that if the respondent had not been deported and the case were now coming before me, I would find that he had not made an entry in 1942. However, collateral attacks on the validity of a deportation order after deportation had taken place, based on changes in judicial and administrative decisions interpreting the law, are permitted only where there is evidence of a gross miscarriage of justice. No evidence of such miscarriage of justice has been adduced, merely a showing that the law is now interpreted differently. * * *

The Service, in its brief supporting the decision of the special inquiry officer, makes no claim that the earlier decision was in accordance with prevailing law as it was interpreted at the time of respondent's *deportation*, but urges that the deportation order is not subject to collateral attack because on November 12, 1946 (the date of the Board's order, which was three and one-half years before the actual deportation) respondent was clearly subject to deportation under the prevailing judicial and administrative determinations.

On appeal, counsel repeats the two contentions made at the hearing. On the "entry" question, he relies not on *Rosenberg* v. *Fleuti*, as assumed by the special inquiry officer, but on *Delgadillo* v. *Carmichael*, 332 U.S. 388 (November 10, 1947) and *DiPasquale* v. *Karnuth*, 158 F. 2d 878 (C.A. 2, January 11, 1947), two cases closer in facts and in time to respondent's proceedings than the *Fleuti* matter. Both were administratively decided before or contemporaneously with the finding of deportability herein, and were in litigation when the Board rendered its decision of November 12, 1946. Both became the prevailing law at least two and one-half years before respondent was deported on a finding made under a theory of law overruled and set aside by those cases.

Had respondent been deported on November 12, 1946, or at any time

prior to the Supreme Court's November 1947 decision in the *Delga-dillo* case, we would be bound, by the weight of administrative and judicial decisions, to hold that he could not now attack the prior deportation, for the reasons advanced by the special inquiry officer and the Service (cf. Gordon and Rosenfield, *Immigration Law and Procedure*, section 4.7h). But neither the finding of deportability nor the order of deportation is clothed with the armor of immunity from attack while the alien is still in the United States and before the order of deportation is executed. Reopening or reconsideration of the proceedings on the administrative level (8 CFR 3.2) may be had as well as judicial review of the validity of the administrative decision (section 106, Immigration and Nationality Act), without the necessity for first showing that there was a gross miscarriage of justice. It is enough to show a change in facts or in the law, whether statutory or case law (for administrative reconsideration or reopening), or to allege error in the administrative decision or that it was arbitrary and capricious (for judicial review). Thus, the changes in the case law in this area which took place between November 12, 1946 and May 15, 1950 must be considered, and followed, in determining whether respondent's deportation was a proper one.

The *DiPasquale* case involved an alien who entrained at Buffalo, New York for a trip to Detroit and who, during the night, was carried into Canada as the train followed its normal route. There was no showing that he knew in advance that the train was scheduled to go through Canada, or that he actually set foot on Canadian soil. Mr. Justice Learned Hand, in holding that there was no entry because the alien had never intended to depart from the United States, stated:

* * * we think that the intent of a carrier, unknown to the alien, to carry him across a border and back again, upon a route whose termini are within the United States, should not be imputed to him. * * *

In *Delgadillo*, the Supreme Court granted certiorari because of a contrary result reached in the Ninth Circuit. Delgadillo was a crew member on an American ship making a coastwise voyage from Los Angeles to New York, during World War II. The ship was torpedoed in the Caribbean Sea and the alien was rescued and taken to Cuba, where he remained for one week until his return to the United States was arranged. The Ninth Circuit held that he had made an entry upon his return from Cuba. The Supreme Court, in reversing and holding that he had not, specifically approved the rationale of *DiPasquale* v. *Karnuth*. Mr. Justice Douglas stated:

* * * In the Smith case it was stated, 289 U.S. p. 425, that "any coming of the alien from a foreign country into the United States whether such coming be the first or any subsequent one" is such an "entry". But those were cases where

471

the alien plainly expected or planned to enter a foreign port or place. Here he was catapulted into the ocean, rescued, and taken to Cuba. He had no part in selecting the foreign port as his destination. His itinerary was forced on him by wholly fortuitous circumstances. If, nonetheless, his return to this country was an "entry" into the United States within the meaning of the Act, the law has been given a captious application as *DiPasquale* v. *Karnuth* (C.C.A.2d, N.Y.) 158 F.2d 878, *supra*, suggests.

In that case an alien traveled between Buffalo and Detroit on a railroad which, unknown to him, passed through Canada. He was asleep during the time he was in transit through Canada and was quite unaware that he had left or returned to this country. The court refused to hold that the alien had made an "entry", for to do so would impute to Congress a purpose to subject aliens "to the sport of chance." 158 F. 2d 879. In this case, petitioner, of course, chose to return to this country knowing he was in a foreign place. But the exigencies of war, not his voluntary act, put him on foreign soil.[1] * * *

In *Yukio Chai* v. *Bonham*, 165 F. 2d 207 (C.A. 9, December 29, 1947), a case squarely in point arising in the same circuit as respondent's case, the court withheld disposition of the case pending the Supreme Court's decision in *Delgadillo*, and then held that a cannery worker in the employ of a Seattle canner, who had been sent to Alaska as a seasonal worker, his transportation both coming and going having been arranged by his employer, had not made an entry into the United States when his vessel, returning from Alaska, had made an unscheduled stop at Victoria, B.C., before landing at Seattle and the alien did not know of the intention of the ship to leave United States waters or of the fact that it had done so. While in the instant case respondent went ashore in Canada to transfer to another ship, the actual knowledge of being in a foreign place or the actual setting foot on foreign soil are not controlling. Delgadillo was ashore a full week in Cuba.

Therefore, from November 1947 until respondent's deportation in May 1950, the decision in respondent's case could not have withstood judicial attack under the law as it was then (and still is) interpreted. This being the case, a showing of gross miscarriage of justice has been made (cf. *Matter of Malone*, Int. Dec. No. 1621), and the validity of the deportation order can and must be examined.

Inasmuch as we are compelled to the finding that respondent made no entry in June 1942, we must find that respondent was not at the time of his deportation properly deportable on the warrant charge, as one excludable for having been convicted of a crime prior to entry. Respondent was convicted of a second crime, abducting a female under the age of 18 for the purpose of sexual intercourse or marriage without consent of her legal guardian. We did not make any finding, in our

---

[1] If this intercoastal voyage had continued without interruption, it is clear that he would not have made an "entry" when he landed at its termination. *United States ex rel. Claussen* v. *Day, supra* (279 U.S. p. 401, 73 L. ed. 759, 49 S. Ct. 354).]

decision of November 12, 1946, as to whether this was a crime involving moral turpitude, since it was then unnecessary to do so. We address ourselves to this point now.

We must look to the elements of this crime, as defined by the statute, to determine whether it involves moral turpitude. *Matter of B—*, 6 I. & N. Dec. 98. Under the laws of the State of Washington, the crime of abduction is committed when the female is under the age of 18 years and is taken, with or without her consent, for the purpose of sexual intercourse *or*, without the consent of her parent or legal guardian, for the purpose of marriage. In the information filed against respondent, both purposes are alleged, in the disjunctive, with no specification as to which was his actual purpose. There was no trial, respondent having pleaded guilty, and the record is bare of any facts to show what respondent's purpose actually was. As we have previously held:

We are not permitted to go behind the record to determine just what transpired. *Mylius* v. *Uhl*. 203 Fed. 152 (S.D., N.Y., 1913). We must determine in each case that which must be shown to establish the guilt of the alien. Accordingly, the definition of the crime must be taken at its minimum. * * * *Matter of B—*, 4 I. & N. Dec. 493.

We consider, therefore, whether the crime of abduction for the purpose of marriage is a crime involving moral turpitude. A crime involving moral turpitude has been defined as an act of baseness, vileness and depravity which is morally reprehensible and intrinsically wrong, *malum in se* (see *Matter of P—*, 6 I. & N. Dec. 795, and cases therein cited). We do not believe that the taking of a female under the age of 18 for the purpose of marriage, without the consent of her legal guardian, is an essentially depraved, base or vile act, repugnant to natural moral standards. That it is not inherently wrong is demonstrated by the fact that the same act is rendered moral and legal by the consent of the female's parent or guardian. We hold that respondent was not convicted of a second crime involving moral turpitude, and was not, by virtue of his convictions, rendered deportable under any section of law in force at the time of his deportation in 1950.

Although we now find that respondent was not properly subject to deportation, he was nevertheless deported and reentered as a nonimmigrant without receiving permission from the Attorney General to reapply for admission after deportation. Also, it might be urged that he would now be excludable on the basis of his conviction for burglary in 1936. Had he not been deported, his status as a resident alien would have continued and none of these disabilities could be urged. We shall therefore exercise our authority to grant to him,

*nunc pro tunc,* such waivers as may be necessary to make his entry in September 1966 the lawful return of a permanent resident alien.

We grant to respondent, *nunc pro tunc,* the following:

Permission to reapply for admission after deportation;

Waiver of excludability under section 212(c), as a returning resident alien, for any possible grounds of excludability arising out of the two convictions of crime herein referred to;

Waiver of passport, immigration visa, reentry permit or other documentation, under section 211(b), with regard to respondent's entry of September 9, 1966.

With the granting of the above, respondent is not deportable, and these proceedings will be terminated.

**ORDER:** It is ordered that the decision of the Board, dated November 12, 1946, finding respondent deportable and ordering him deported, be and the same is hereby set aside.

*It is further ordered* that the decision of the special inquiry officer under date of December 28, 1966, finding respondent deportable as charged, be and the same is hereby set aside.

*It is further ordered* that the instant proceedings be and the same are hereby terminated.

474